# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|                                                   |     |                      |
|---------------------------------------------------|-----|----------------------|
| **OLD TOWN UTILITY & TECHNOLOGY PARK, LLC, et al.,** | )<br>)<br>) |                      |
| **Plaintiffs,**                                   | )<br>) |                      |
| **v.**                                            | )   | **2:19-cv-00029-JDL**|
| **CONSOLIDATED EDISON, SOLUTIONS, INC., et al.,**  | )<br>)<br>)<br>) |                      |
| **Defendants.**                                   | )   |                      |

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

The Plaintiffs, Old Town Utility & Technology Park, LLC, Relentless Capital Company, LLC, and Samuel Eakin, allege that several of the named Defendants operated a criminal enterprise to procure a long-term energy supply contract with the University of Maine System (the "University"). The Defendants have filed two motions to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). The first, brought by 14 of the Defendants, seeks to dismiss the complaint in its entirety (ECF No. 48).[1] The second, filed by two of the Defendants—the Trustees of the University and former University Chancellor James Page (together, the "University Defendants")—seeks the dismissal of Count XIV,

---

[1] The motion to dismiss the complaint in its entirety (ECF No. 48) is brought by Consolidated Edison Solutions, Inc., Consolidated Edison Development, Inc., Consolidated Edison Energy, Inc., Con Edison Clean Energy Business, Inc., Ward Strosser, Jack Bosch, Mark Noyes, Paul Mapelli, James W. Sewall Company, David Edson, David Stevens, Treadwell Franklin Infrastructure Capital, LLC, Steven Jones, and former University Chancellor James Page.

which prays for injunctive and declaratory relief (ECF No. 49).[2]  For reasons I will explain, I grant the Defendants' motions to dismiss in part and deny them in part.

## I.  BACKGROUND

The complaint (ECF No. 1-4) alleges the following facts, which I treat as true for purposes of the motions to dismiss.  Because the complaint is voluminous, containing 385 numbered paragraphs spread over 126 pages, I focus on the allegations implicated by the motions to dismiss.  I treat the facts alleged in the complaint as true for purposes of ruling on the motions to dismiss.

In short, the complaint alleges that certain of the Defendants operated a criminal enterprise to procure a long-term energy supply contract with the University, and were able to do so because public entities and officials associated with the University failed to follow governmental procurement and public corruption laws. At the heart of the alleged conspiracy are the complaint's allegations that former University Chancellor Page had an undisclosed financial interest in James W. Sewall Company ("Sewall Company"), that he faced a significant financial gain or loss depending on whether Sewall Company and its business partners succeeded in obtaining the energy contract with the University, and that he manipulated the public bid process to favor Sewall Company and its partners.  The complaint alleges that, as a result, the Plaintiffs were wrongfully excluded from potential business opportunities they would have been entitled to under contracts with Sewall Company

---

[2] People's United Bank, N.A., a named defendant in the complaint, previously filed a motion to dismiss (ECF No. 50) the single count in the complaint against it, which I granted.  *See* ECF No. 85.  People's United Bank, N.A. is therefore no longer a party to this suit.

and some other defendants. The alleged conspiracy involves a complicated matrix of individual actors and their related entities.

## A.     Formation of Old Town Utility and the Request for Proposals

In December 2015, Plaintiff Relentless Capital Company, LLC ("Relentless Capital") and Sewall Company formed Plaintiff Old Town Utility & Technology Park, LLC ("Old Town Utility") for the purpose of acquiring and redeveloping the Expera Mill Facility (the "Mill"), a roughly 300-acre property containing a warehouse building, a waste water treatment plant, a 16-megawatt biomass boiler, and additional power generation assets. Plaintiff Samuel Eakin is the manager of both Relentless Capital and Old Town Utility. David Edson is the President and CEO of Sewall Company. In December 2015, Old Town Utility began discussions with the Mill's owner about purchasing the Mill. In January 2016, Old Town Utility began discussions with the City of Old Town about investing in and/or financing the acquisition of the Mill. Some time later, Old Town Holdings II, LLC ("Old Town Holdings") joined Old Town Utility, and in July 2016, the three members of Old Town Utility executed the Old Town Utility Operating Agreement. Joseph Deschenes is the sole member of Old Town Holdings.

In February 2016, the University posted a request for proposals (the "RFP") seeking a proposal for long-term energy solutions to meet the University's energy needs. Relentless Capital and Sewall Company agreed to jointly develop a proposal in response to the RFP. Relentless Capital recruited Self-Gen Inc., a power generation engineering firm, to collaborate on developing the proposal. Self-Gen Inc., in turn, recruited Consolidated Edison Solutions, Inc. ("Con Ed Solutions") to join the

team.[3]  The parties agreed that Con Ed Solutions would act as the engineering, procurement, and construction contractor; Self-Gen Inc. would act as subcontractor for engineering; and Relentless Capital and Sewall Company would handle financial arrangements and negotiations to acquire, finance, and fund the development of the Mill.  In March 2016, Relentless Capital and Con Ed Solutions entered into a "Teaming Agreement" related to their submission of a joint proposal for the RFP.  The Teaming Agreement provided that it would automatically terminate after twelve months, absent a written renewal.  Under the Teaming Agreement, Con Ed Solutions had primary responsibility for submitting proposals to the University and was required to name Relentless Capital as the subcontractor if Con Ed Solutions won the RFP bid.

## B.    Former Chancellor Page's Connection to Sewall Company

Defendant James Page was appointed Chancellor of the University in March 2012.  At the time, he was the CEO and a majority shareholder of Sewall Company.  The complaint alleges that at the time of his appointment as Chancellor, Page claimed that he had divested himself of all business holdings with Sewall Company.  The complaint, however, posits that (1) while CEO of Sewall Company, Page had signed a multimillion-dollar personal loan guarantee to help finance Sewall Company's mortgage, and (2) before becoming Chancellor, Page sold his stock to Sewall Company in exchange for divestiture notes in the company.  The complaint

---

[3]  Con Ed Solutions, Defendant Consolidated Edison Development, Inc., and Defendant Consolidated Edison Energy, Inc. are wholly owned subsidiaries of Defendant Con Ed Clean Energy Businesses, Inc., which, in turn, is a wholly owned subsidiary of Consolidated Edison, Inc. (collectively, the "Con Ed Companies").  Defendants Ward Strosser, Jack Bosch, Mark Noyes, and Paul Mapelli are employees of the Con Ed Companies.  Collectively, the Defendants described in this paragraph are referred to as the "Con Ed Defendants."

alleges that the net effect of Page serving as a creditor and guarantor of various Sewall Company notes would give Page a significant financial interest tied to Sewall Company's success.

## C.    The Phase I Proposal and Efforts to Exclude the Plaintiffs

In March 2016, the Con Ed Solutions team submitted its proposal for Phase I of the RFP.  At around the same time, the complaint alleges that Joseph Deschenes secretly introduced CVG, Inc. ("CVG") and Maine Distributed Power, LLC to Con Ed Solutions to facilitate their acquisition of the Mill and participation in Con Ed Solutions' RFP bid.  Sewall Company, acting through Edson, and Con Ed Solutions, acting through Strosser, also recruited Treadwell Franklin Infrastructure Capital, LLC ("Treadwell") to replace Relentless Capital on the Con Ed Solutions team. The Con Ed Solutions team recruited CVG to replace Old Town Utility as the purchaser of the Mill and recruited Treadwell to replace Relentless Capital as the finance subcontractor.  Treadwell purchased Sewall Company in May 2018.

The complaint alleges that the Con Ed Defendants knew Page had both a financial stake in Sewall Company and the ability to influence and ultimately decide the outcome of the RFP.  The complaint further alleges that the Con Ed Defendants conspired to exclude Eakin, Old Town Utility, and Relentless Capital from acquiring the Mill and participating in the RFP process because they were concerned that Eakin would insist on publicly disclosing Page's financial interest in Sewall Company to avoid any conflict of interest or appearance thereof.  The Con Ed Defendants allegedly wanted to avoid such public disclosure because they did not want to risk losing the

RFP bid, especially given that Sewall Company was having financial troubles and likely needed to win the RFP to survive.

**D.      Phase II and the Ultimate Sale of the Mill**

Although the University was scheduled to announce the finalists who would be invited to provide submissions for Phase II of the RFP in May 2016, the complaint alleges that the Defendants used their influence with the University to delay the announcement so as to disrupt Old Town Utility's purchase of the Mill, which was tied to the announcement timeline.

While the Plaintiffs were allegedly working to close on their purchase of the Mill, Eakin was never notified that CVG and the Mill's owner had signed a letter of intent on September 1, 2016, for CVG to buy the Mill. In October 2016, the Mill's owner notified Old Town Utility that CVG had offered a "cash deal" for the Mill and gave Old Town Utility two weeks to make a counter-offer. Ultimately, the Mill's owner, MFGR, LLC ("MFGR"), decided to sell the Mill to CVG. In the ensuing months, Con Ed Solutions removed Relentless Capital from the RFP team, and partnered with PEFCo, a company formed by CVG, Maine Distributed Power, and their partners to redevelop the Mill. This was done without notice to Eakin, and Eakin never received a formal notice terminating the Teaming Agreement with Con Ed Solutions.

In July 2017, the Plaintiffs filed suit in Maine state court against MFGR and one of the seller's principals, seeking, in part, to prevent the sale of the Mill to OTM Holdings, LLC and Powerhouse Holdings, LLC, which were created by CVG. *Old Town Technology & Utility Park, LLC, et al. v. MFGR, LLC, et al. ("Eakin I")*, 2018

Me. Bus. & Consumer LEXIS 2018. The Plaintiffs later amended the complaint to add Old Town Holdings and Deschenes. In *Eakin I*, the Plaintiffs brought claims for breach of contract (including breach of the Old Town Utility Operating Agreement), promissory estoppel, unjust enrichment, breach of fiduciary duty, and violation of 10 M.R.S.A. § 1101. The Plaintiffs also sought a preliminary injunction prohibiting the transfer of the Mill.

Despite the ongoing litigation, the Mill was conveyed to OTM Holdings and Powerhouse Holdings on January 29, 2018. The state court denied the Plaintiffs' motion for a preliminary injunction two days later. *Eakin I*, 2018 Me. Bus. & Consumer LEXIS 5, *11. Later, the state court granted the Defendants' motions to dismiss as to one of the claims of promissory estoppel, restraint of trade/monopoly and breach of fiduciary duty claims. *See Eakin I*, 2018 Me. Bus. & Consumer LEXIS 6, *32; *Eakin I*, 2018 Me. Bus. & Consumer LEXIS 18, *7. What remained of that case was ultimately dismissed.[4] The Plaintiffs filed this action on October 10, 2018, in Maine state court, and the Defendants later removed the case to federal court.

## II. LEGAL ANALYSIS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

---

[4] The Plaintiffs state that *Eakin I* "settled and was dismissed near the end of discovery." ECF No. 60 at 25. The Defendants state that the Plaintiffs voluntarily dismissed the case. ECF No. 48 at 22.

unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). A two-pronged approach is employed to resolve a motion to dismiss. *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). First, the Court must first "isolate and ignore statements in the complaint that simply offer legal labels and conclusions." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Second, the Court must take the remaining well-pleaded facts as true, "drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Id.* In other words, the question is whether the well-pleaded facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The Defendants move to dismiss all of the Plaintiffs' claims. I address each claim in order before turning to the Defendants' final argument that the complaint fails to state any claims against the individual defendants.[5]

## A. Racketeer Influenced and Corrupt Organization Act ("RICO") Claims (Counts I and II)

The Plaintiffs assert a RICO claim under 18 U.S.C.A. § 1962(c) against all the Defendants except for the Trustees of the University and current University Chancellor Dannel P. Malloy.[6] Section 1962(c) makes it:

> unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct

---

[5] The Plaintiffs voluntarily dismissed their claim for equitable indemnification (Count XIII), ECF No. 60 at 49, and I therefore do not consider it further.

[6] James Page retired as Chancellor of the University on June 30, 2019. *See* ECF No. 82. Dannel P. Malloy succeeded Page as Chancellor effective July 1, 2019. *Id.* Because the Plaintiffs named James Page as a Defendant in both his individual capacity and his official capacity as Chancellor, Chancellor Malloy has been substituted as Defendant for the official-capacity claim. *Id.*; *see* Fed. R. Civ. P. 25(d). The Plaintiffs do not allege either of their RICO claims against former Chancellor Page in his official capacity.

of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C.A § 1962(c) (West 2019). Thus, to state a civil RICO claim under § 1962(c), "a plaintiff must allege: (1) conduct, (2) of an enterprise, (3) through either a pattern of racketeering activity or a single collection of an unlawful debt." *Home Orthopedics Corp. v. Rodriguez*, 781 F.3d 521, 528 (1st Cir. 2015) (internal quotation marks and alterations omitted). The Defendants contend the complaint fails to allege the existence of an enterprise, a pattern of racketeering, or any racketeering activity. I find that the complaint fails to allege a pattern of racketeering and I address only that element.[7]

"[T]o prove a pattern of racketeering activity, a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (emphasis in original). This is known as the "continuity plus relationship" standard. *Giuliano v. Fulton*, 399 F.3d 381, 387 (1st Cir. 2005). Thus, a "pattern of racketeering activity . . . does *not* encompass a single criminal event, a single criminal episode, [or] a single 'crime' (in the ordinary, nontechnical sense of that word) . . . even if that single episode involves behavior that amounts to several crimes (for example, several unlawful mailings)." *Apparel Art Int'l, Inc. v. Jacobson*, 967 F.2d 720, 722–23 (1st Cir. 1992) (emphasis in original).

---

[7] The Plaintiffs also assert a claim (Count II) based on RICO's conspiracy provision, 18 U.S.C.A. § 1962(d). Because this claim alleges that the Defendants engaged in a conspiracy to violate § 1962(c), *see* ECF No. 1-4 ¶ 262, "the conspiracy claim suffers from precisely the same infirmity as the section 1962(c) claim, and need not be discussed separately." *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 45 n.4 (1st Cir. 1991).

There are two methods to satisfy the continuity plus relationship standard: the open-ended approach and the closed-ended approach. *Giuliano*, 399 F.3d at 387. Under the open-ended approach, a plaintiff "need not wait for a long-term pattern to develop . . . so long as the alleged 'racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business.'" *Id.* at 387 (quoting *H.J. Inc.*, 492 U.S. at 242). Under the closed-ended approach, by contrast, a plaintiff must show "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 230. "[W]here the temporal duration of the alleged activity and the alleged number of predicate acts are so extensive that common sense compels a conclusion of continuity, closed-ended continuity should be found." *Giuliano*, 399 F.3d at 387 (internal quotation marks and citation omitted). Accordingly, the First Circuit found that 95 fraudulent mailings over a four-and-a-half-year period was sufficient to show continued criminal activity. *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 447 (1st Cir. 1990). By contrast, an allegation of "16 predicate acts over a six-month period is inadequate to establish a closed-ended pattern of racketeering activity." *Giuliano*, 399 F.3d 381 at 390. Only in "middle ground" closed-ended cases "where the duration and extensiveness of the alleged conduct does not easily resolve the issue" does the court "examine other indicia of continuity." *Id.* at 387.

The Defendants contend that the complaint fails to establish either open- or closed-ended continuity.

1.      **Open-Ended Continuity**

The complaint asserts that there is open-ended continuity because the complaint alleges that the racketeering activity "will continue into the future":

> The Enterprise's key relationships are still operating, and there is a significant danger that the Enterprise's pattern of racketeering activity will continue into the future. Sewall [Company], Treadwell and Con Ed Solutions intend to partner on future energy and infrastructure project bids (a relationship that is only tighter now that Treadwell has purchased Sewall [Company]), including public education energy services bids in Maine. [The] Chancellor of the [University] . . . is in a position to ensure favorable treatment for the Enterprise in exchange for future favors or as reward for rescuing him from his guarantee of [Sewall Company's] debt.

ECF No. 1-4 ¶ 215. As I will explain, these allegations are unduly speculative.

"Although the pleadings should generally be construed liberally" when evaluating a motion to dismiss, "a greater level of specificity is required in RICO cases." *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 443 (1st Cir. 2000), *amended on denial of reh'g* (Dec. 15, 2000) (internal citations omitted). To plead open-ended continuity, a plaintiff must point to facts that would establish that the alleged criminal conduct is a continuing threat. Thus, in *Systems Management, Inc. v. Loiselle*, 303 F.3d 100 (1st Cir. 2002), the First Circuit dismissed a RICO case alleging that an employer engaged in mail fraud to conceal its non-compliance with state wage laws so as to maintain its contract. *Id.* at 103, 106. The court stated that, "[i]f [the defendant] had concrete plans to bid on contracts on other jobs and to carry them out through acts of mail fraud, the 'continuing threat' label would be supported, and the case would fit within what the Supreme Court has viewed as an 'open ended' pattern of racketeering sufficient under RICO." *Id.* at 106. But the plaintiffs in that case

could not point to any such evidence and thus could not establish a continuing threat. *Id.*

Here, as in *Loiselle*, the Plaintiffs allege no "concrete plans" by the Defendants. Although the Plaintiffs warn of a "significant danger" of future racketeering activity, ECF No. 1-4 ¶ 215, and argue that "there is no reason to believe [the Defendants] will not replicate the business model with future, similar projects," ECF No. 60 at 35, the complaint contains no specific allegations of any future plans by the Defendants to do so, or of any actions taken by the Defendants suggesting an intent to do so. The complaint also contains no allegations that "racketeering activity might be a regular way of conducting defendant's ongoing legitimate business . . . or of conducting or participating in an ongoing and legitimate RICO enterprise." *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 19 (1st Cir. 2000) (internal quotation marks omitted). Therefore, the allegations in the complaint do not support open-ended continuity. *See Kenda Corp. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 233 (1st Cir. 2003) (holding that multiple criminal acts "directed toward one transaction" did not establish open-ended continuity where the plaintiffs could not prove that the defendants "had plans to take over another company or pool league in the same fraudulent manner").

## 2. Closed-Ended Continuity

Nor do the complaint's allegations support closed-ended continuity. "[A] closed-ended pattern sometimes can be established by examining only the number of alleged predicate acts and the duration of the alleged racketeering activity." *Home Orthopedics Corp.*, 781 F.3d at 529. Here, the complaint alleges that the Defendants'

racketeering activity spanned approximately two years, but it does not clearly enumerate the alleged predicate acts. Thus, it is difficult to say whether "the temporal duration of the alleged activity and the alleged number of predicate acts are so extensive that common sense compels a conclusion of continuity." *Giuliano*, 399 F.3d at 387.

Nevertheless, even considering other indicia of continuity under the "middle ground" analysis, *see id.*, the complaint fails to establish closed-ended continuity. These indicia include, "for instance, whether the defendants were involved in multiple schemes, as opposed to one scheme with a singular objective; whether the scheme affected many people, or only a closed group of targeted victims; and whether the scheme had the potential to last indefinitely, instead of having a finite nature." *Home Orthopedics Corp.*, 781 F.3d at 529 (internal quotation marks omitted).

The First Circuit's decision in *Efron* is instructive. 223 F.3d at 12. In *Efron*, the plaintiff partnered with the defendants in a business venture that went awry. *Id.* at 13. The plaintiff alleged that the defendants deliberately caused a project involving the development of a hotel and casino to lose money through various acts of mismanagement, and the complaint identified seventeen instances of alleged mail or wire fraud during a twenty-one-month period as the unlawful acts supporting a RICO claim. *Id.* at 13−14. Because the court found that seventeen acts over twenty-one months did not compel a finding of closed-ended continuity, the court looked to other indicia of continuity, conducting what is now known as a "middle ground" analysis. *Id.* at 18; *see also Giuliano*, 399 F.3d at 387, 390. The court concluded that

the complaint, as a whole, did not establish closed-ended continuity because the alleged deceptive acts aimed to accomplish the "single goal of transforming the ownership of the Partnership" and inflicted a single injury on a "closed group of targeted victims." *Efron*, 223 F.3d at 18; *see also Apparel Art*, 967 F.2d at 723–24 (holding that the allegations did not show closed-ended continuity where "several instances of criminal behavior . . . comprise[d] a single effort to obtain . . . one $96 million Defense Department contract").

As in *Efron*, the Plaintiffs' complaint alleges a single scheme spanning roughly two years and pursuing a specific goal: here, procuring an energy contract with the University. The Plaintiffs concede that all alleged racketeering activity concerning the energy contract has ceased. A focused, finite scheme such as this does not establish closed-ended continuity. *See Schultz v. R.I. Hosp. Tr. Nat'l Bank, N.A.*, 94 F.3d 721, 732 (1st Cir. 1996) (affirming the dismissal of a RICO case where "the alleged racketeering acts attributed to [the defendant], taken together, comprise a single effort to facilitate a single financial endeavor: the purchase and renovation of [a] resort" (internal quotation marks and alteration omitted)).

The Plaintiffs attempt to distinguish *Efron*, arguing that the victims here are more numerous than in that case. Specifically, they assert that the scheme here harmed not just them, but also "the Maine public [and] the University's students," whereas the scheme in *Efron* affected only three victims. ECF No. 60 at 36. But this argument is belied by the complaint, which states that "[t]he Plaintiffs were the intended target of the . . . Defendants' conduct." ECF No. 1-4 ¶ 259. More importantly, when determining closed-ended continuity, the First Circuit has not

viewed otherwise narrow schemes as far-reaching just because the alleged racketeering activity implicated government contracts and, in turn, the public. *See, e.g.*, *Apparel Art*, 967 F.2d at 721−24; *Loiselle*, 303 F.3d at 105−06; *cf. Giuliano*, 399 F.3d at 386, 390 & n.8 (counting only one individual and his company as victims despite the plaintiffs' allegations that the defendants had defrauded the state government and thus posed a "societal threat"). As such, only the three Plaintiffs—not University students or the public—are victims for the purposes of this analysis, which weighs against finding closed-ended continuity.

The Plaintiffs also attempt to distinguish *Efron* by arguing that the scheme here involved many actors and business entities and operated consistently over approximately two years, whereas *Efron* involved one local business partnership whose criminal activity was conducted almost exclusively during a period of 90 days. While the alleged scheme here may be more complex than in *Efron*, complexity alone does not establish closed-ended continuity. *See Apparel Art*, 967 F.2d at 723 (contrasting a "single, complex interstate bank robbery," which is not continuous, with a "a string of interstate robberies," which may be). Ultimately, the "combination of single scheme, single injury, and few victims makes it virtually impossible" for the Plaintiffs to establish closed-ended continuity. *Efron*, 223 F.3d at 19 (internal quotation marks and alteration omitted).

Because the Plaintiffs' allegations do not establish the required "pattern of racketeering" through either open- or closed-ended continuity, their RICO claims (Counts I and II) are dismissed.

## B.    Fraud (Count III)

Under Maine law, a plaintiff must allege the following elements to state a claim of fraud:

(1) A party made a false representation,
(2) The representation was of a material fact,
(3) The representation was made with knowledge of its falsity or in reckless disregard of whether it was true or false,
(4) The representation was made for the purpose of inducing another party to act in reliance upon it, and
(5) The other party justifiably relied upon the representation as true and acted upon it to the party's damage.

*Barr v. Dyke*, 49 A.3d 1280, 1286–87 (Me. 2012) (emphasis omitted).  While "state law governs the burden of proving fraud at trial, the procedure for pleading fraud in federal courts in all diversity suits is governed by the special pleading requirements of Federal Rule of Civil Procedure Rule 9(b)."  *Darling v. W. Thrift & Loan*, 600 F. Supp. 2d 189, 196 (D. Me. 2009) (quoting *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985)).  Rule 9(b) requires "specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred."  *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) (quoting *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir. 1980)).  "[M]ere allegations of fraud, corruption or conspiracy, averments to conditions of mind, or referrals to plans and schemes are too conclusional to satisfy the particularity requirement, no matter how many times such accusations are repeated."  *Hayduk*, 775 F.2d at 444.

The complaint's allegations of fraud fall into two categories: false representations and omissions.  I analyze each in turn, and I conclude that all of

Count III should be dismissed for failure to state a claim upon which relief can be granted.

### 1.    False Representations

The complaint alleges that Con Ed Solutions and Sewall Company made false representations by repeatedly denying the existence of a financial relationship between former Chancellor Page and Sewall Company, and by claiming that Page's potential conflict of interest had been "vetted." ECF No. 1-4 ¶ 268. Rule 9(b) requires allegations of fraud to state the time, place, and content of the alleged false representations. "Although the Plaintiffs claim that similar statements were repeated . . . , they fail to provide any further details, and thus they fail to meet the specificity required by Rule 9(b)." *Howell v. Advantage Payroll Servs., Inc.*, No. 2:16-CV-438-NT, 2017 WL 782881, at *7 (D. Me. Feb. 28, 2017). Thus, the complaint does not meet the first element of fraud under Maine law, because it fails to sufficiently plead the time, place, and content of the alleged representations.[8]

### 2.    Omissions

The complaint also alleges several instances of fraud by omission. First, the complaint alleges that Con Ed Solutions, acting through Strosser and Bosch, hid the existence of its teaming agreements with CVG and Maine Distributed Power, and its "relationship with and support for the efforts of [Old Town Utility]'s competitor for ownership of the [Mill]." ECF No. 1-4 ¶ 274. Second, the complaint alleges that Con Ed Solutions, acting through Strosser and Bosch, and Sewall Company, acting

---

[8] Because I conclude that the first element has not been met, I do not address the remaining elements with respect to the allegations in ¶ 268 of Count III.

through Edson, hid the existence of their coordination with CVG. Third, the complaint alleges that Con Ed Solutions, acting through Strosser, hid the fact that Con Ed Solutions had procured a delay in the University's announcement of finalists for Phase II of the RFP.

To establish that a failure to disclose or an omission rises to the level of a false representation, a plaintiff must prove either "(1) active concealment of the truth, or (2) a specific relationship imposing on the defendant an affirmative duty to disclose." *Fitzgerald v. Gamester*, 658 A.2d 1065, 1069 (Me. 1995). "'Active concealment of the truth' connotes steps taken by a defendant to hide the true state of affairs from the plaintiff." *Kezer v. Mark Stimson Assocs.*, 742 A.2d 898, 905 (Me. 1999). Here, the complaint does not contain any factual allegations that Con Ed Solutions or Sewall Company took active steps to conceal any of the alleged omissions referenced above. Thus, the Plaintiffs can only establish a false representation by omission under the second prong, which requires them to show that the Defendants had a fiduciary duty to disclose the information at issue.

The Plaintiffs allege that the Defendants had a fiduciary duty to disclose this information under the common law, Maine statutory law, and the Operating Agreement. A common law fiduciary relationship exists when there is "(1) the actual placing of trust and confidence in fact by one party in another, and (2) a great disparity of position and influence between the parties at issue." *Ramsey v. Baxter Title Co.*, 54 A.3d 710, 712 (Me. 2012) (quoting *Bryan R. v. Watchtowner Bible & Tract Soc. of N.Y., Inc.*, 738 A.2d 839, 846 (Me. 1999)). The complaint does not allege any facts giving rise to a great disparity of position between the Plaintiffs and the

Defendants. Therefore, the complaint does not sufficiently allege a common law fiduciary relationship with the Plaintiffs, and a general allegation of a fiduciary or confidential relationship is not a sufficient basis for establishing the existence of one. *Bryan R.*, 738 A.2d at 846; *Dickey v. Goldblatt,* 2015 Me. Super LEXIS 134, at *7.

The complaint does, however, sufficiently allege that Sewall Company and Edson had a fiduciary relationship with the Plaintiffs roughly spanning the latter half of 2016 under the terms of the Operating Agreement, which explicitly addressed fiduciary responsibilities. *See infra* Section II.E.2. Nevertheless, the allegation as to Sewall Company and Edson does not specify the time and place of the omissions as required by Rule 9(b). Though other allegations in the complaint establish a loose timeline of Sewall Company and Edson's supposed involvement in CVG, *see, e.g.,* ECF No. 1-4 ¶¶ 136–38, those allegations are pled on "information and belief," and "information-and-belief pleading is not sufficient to satisfy the rule requiring pleading with particularity." *Cordero-Hernandez v. Hernandez-Ballesteros*, 449 F.3d 240, 247 (1st Cir. 2006).

Because there are no factual allegations that either Con Ed Solutions or Sewall Company actively concealed the alleged omissions from the Plaintiffs, and because there are no factual allegations to support a finding that there was a fiduciary relationship between Con Ed Solutions or Sewall Company and the Plaintiffs when the alleged fraudulent activity occurred, the complaint fails to state a claim for fraud by omission.

## C. Deceptive Trade Practices (Count IV)

Plaintiffs allege in Count IV that the Con Ed Defendants "falsely represented to the University that the Con Ed Solutions team could provide significant energy savings to the University," in violation of the Deceptive Trade Practices Act, 10 M.R.S.A. § 1212 ("UDTPA") and the common law. ECF No. 1-4 ¶¶ 295–96. The Defendants argue that the claim must be dismissed because the UDTPA only provides for injunctive relief and the Plaintiffs seek only monetary damages.

"[T]he UDTPA, 'by its own terms, only provides for injunctive relief' . . . and does not 'support a legal claim.'" *J.S. McCarthy Co. v. Brausse Diecutting & Converting Equip., Inc.*, 340 F. Supp. 2d 54, 62 (D. Me. 2004) (quoting *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 629 F.Supp. 644, 647 (D. Me. 1986)). "The injunctive remedy authorized by the [UDTPA] applies to a claim of something like ongoing deception . . . . It does not fit a claim for monetary damages based upon a one-time breach of warranty claim." *Am. Aerial Servs., Inc. v. Terex USA LLC*, No. 2:12-cv-00361-GZS, 2013 WL 1898535, at *5 (D. Me. Mar. 6, 2013), *aff'd*, 2013 WL 1898533 (D. Me. May 7, 2013). Thus, Count IV is dismissed to the extent it seeks relief under the UDTPA.

The Plaintiffs argue that Count IV should nonetheless survive because it also seeks relief under the common law. But the Plaintiffs have not identified any deceptive trade practice claim under Maine common law upon which the Plaintiffs could recover based on the conduct alleged in Count IV. In *Sebago Lake Camps, Inc. v. Simpson*, 434 A.2d 519 (Me. 1981), the Maine Law Court noted that prior to the UDTPA, deceptive trade practice claims were viewed as claims for unfair competition,

*id.* at 521, "[t]he essence of [which] consists in beguiling, or attempting to beguile, the purchasing public into buying the wares of the offender under the belief that they are purchasing the wares of a rival." *Lapointe Mach. Tool Co. v. J. N. Lapointe Co.*, 99 A. 348, 350 (Me. 1916), *cited in Sebago Lake*, 434 A.2d at 521. Count IV's allegations that the Con Ed Defendants misrepresented the energy savings they could provide to the University do not state a claim for unfair competition. Under Fed. R. Civ. P. 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." I conclude that the complaint fails to contain such a statement regarding the Plaintiffs' common law claim for deceptive trade practices. Count IV is therefore dismissed in its entirety.

## D. Tortious Interference with an Advantageous Business Relationship (Counts V and VI)

A claim under Maine law for tortious interference with prospective economic advantage requires a plaintiff to prove the following elements: "(1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with that contract or advantage through fraud or intimidation; and (3) that such interference proximately caused damages." *Rutland v. Mullen*, 798 A.2d 1104, 1110 (Me. 2002) (footnotes omitted).

The complaint's claims for tortious interference incorporate the allegations of fraud in Count III, while also asserting two additional allegations of fraud.[9] As

---

[9] Although the complaint alleges in Count V that the Defendants interfered with Old Town Utility, Relentless Capital, and Eakin's prospective economic advantages "through fraud *and/or intimidation*," ECF No. 1-4 ¶ 304 (emphasis added), the complaint does not allege any facts or otherwise explain how the Defendants used intimidation to gain an economic advantage. The Defendants therefore argue that the Plaintiffs fail to state a claim with respect to tortious interference on the basis of intimidation. The Plaintiffs responded to the motion to dismiss by putting forth, for

already discussed, fraud claims are subject to a heightened pleading standard under Rule 9(b), and the same standard applies to allegations of fraud within a claim for tortious interference. *See Howell v. Advantage Payroll Servs., Inc.*, No. 2:16-CV-438-NT, 2017 WL 782881, at *6–7 (D. Me. Feb. 28, 2017). Because I have already concluded that the fraud allegations in Count III fail to satisfy Rule 9(b)'s heightened pleading standard, I dismiss Counts V and VI to the extent they depend on those allegations.[10]

Two additional fraud allegations remain. First, Count V alleges that "Page falsely represented to the University . . . and to all of the Con Ed Solutions team's competitors in the RFP process the existence of his financial stake in Sewall [Company] through his failure to disclose it." ECF No. 1-4 ¶ 313. The Plaintiffs allege that they were harmed by this alleged omission because "the Con Ed Solutions team's competitors justifiably relied on the misrepresentation" and because "the need to protect the misrepresentation from exposure by Eakin" caused the Con Ed Defendants "to support [CVG] in acquiring the Facility." *Id.* ¶¶ 134, 313. Even assuming this allegation satisfies Rule 9(b)'s particularity requirement, the

---

the first time, factual allegations that purport to lay out a theory of intimidation by the Con Ed Defendants, Treadwell, and Page. But in reviewing a 12(b)(6) motion, courts are limited to considering the complaint and its attachments. *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 73 (1st Cir. 2014). Therefore, I do not analyze the factual allegations raised for the first time in the Plaintiffs' Opposition to Defendants' Motion to Dismiss, and I conclude that the Plaintiffs have not stated a tortious interference claim upon which relief can be granted under a theory of intimidation. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal quotation marks and alteration omitted)).

[10] In their opposition papers, the plaintiffs describe Count V as relying "chiefly on the Count III frauds" but adding "the fraud inherent in the delay in the Phase I announcement." ECF 60 at 46. Count V of their complaint, however, quotes from Count III nearly verbatim on this topic and specifically references the allegation concerning the delay in the RFP announcement as "described in Count III." ECF 1-4 ¶ 311.

complaint does not allege either of the requirements of fraud by omission: that Page actively concealed this fact from the Con Ed Solutions team's competitors or that a special relationship obligated Page to disclose this information to them.

Second, Count VI alleges that "Con Ed Solutions'[] removal of Relentless [Capital] as a team member itself constituted fraud, as Con Ed Solutions and Page hid the fact of this team change from competing RFP bidders."  ECF No. 1-4 ¶ 319. The allegation here also fails to provide the details necessary to satisfy the Rule 9(b) standard of pleading.  Thus, this claim, and all of Counts V and VI must be dismissed.

### E.    Breach of Contract (Counts VII and X)

The Plaintiffs bring two claims for breach of contract, one against Con Ed Solutions arising out of the Teaming Agreement (Count VII), and one against Edson, Sewall Company, and Treadwell arising out of the Operating Agreement (Count X).

#### 1.    The Teaming Agreement (Count VII)

The Plaintiffs allege that Con Ed Solutions breached the Teaming Agreement by failing to name Relentless Capital as the subcontractor in its RFP bid, failing to exert all reasonable efforts to secure Relentless Capital's selection as the subcontractor, secretly removing Relentless Capital from the RFP team, and improperly terminating the Teaming Agreement without cause.  The Plaintiffs further allege that Con Ed Solutions breached the covenant of good faith and fair dealing by signing teaming agreements with CVG and Maine Distributed Power and by failing to disclose those relationships, by deceiving Eakin about Page's financial stake in Sewall Company, and by conspiring to oust the Plaintiffs from the RFP team.

The Teaming Agreement is governed by New York law pursuant to Paragraph 15 of the agreement. *See* ECF No. 1-6 ¶ 15. To state a breach of contract claim under New York law, a plaintiff must allege (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages. *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (citing *First Inv'rs Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)). The Defendants argue that they could not have improperly terminated the Teaming Agreement because the Teaming Agreement expired by its own terms on March 4, 2017. The Defendants further argue that they did not breach the Teaming Agreement by failing to name Relentless Capital in its bid because the Teaming Agreement expired before the bid was submitted and thus there was no enforceable contract on that date. However, the Plaintiffs argue that the Defendants breached the Teaming Agreement, not just by failing to name Relentless Capital in the bid, but also by failing to "exert all reasonable efforts to secure the selection of [Con Ed Solutions] as the prime contractor for the Program and the selection of [Relentless Capital] as subcontractor." ECF No. 1-6 ¶ 6. Thus, the complaint plausibly alleges that the Con Ed Defendants breached the Teaming Agreement prior to its termination.

The Defendants further argue that because the Teaming Agreement did not preclude Con Ed Solutions from entering into agreements with other entities, Con Ed Solutions did not violate the covenant of good faith and fair dealing. Under New York law, "[t]he implied covenant of good faith and fair dealing between parties to a contract embraces a pledge that 'neither party shall do anything which will have the

effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Moran v. Erk*, 901 N.E.2d 187, 190 (N.Y. 2008) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002)). However, "a covenant of good faith and fair dealing can be implied only where the implied term is consistent with other mutually agreed upon terms in the contract." *Horn v. New York Times*, 790 N.E.2d 753, 756 (N.Y. 2003) (internal quotation marks omitted). The Defendants contend that Count VII's allegations seek to "add to the contract a substantive provision not included by the parties." ECF No. 48 at 47 (quoting *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005)). However, "the duties of good faith and fair dealing . . . do encompass any promises which a reasonable person in the position of the promisee would be justified in understanding were included," *511 W. 232nd Owners Corp.*, 773 N.E.2d at 500–01 (internal quotation marks and citations omitted), and, as noted above, the Teaming Agreement required the parties to exert reasonable efforts to secure Relentless Capital as the subcontractor for the RFP bid, *see* ECF No. 1-6 ¶ 6. The Con Ed Defendants' alleged conspiracy to oust the Plaintiffs from the RFP team is contrary to the requirements of Paragraph 6. Count VII therefore adequately pleads a violation of the covenant of good faith and fair dealing.

Next, the Defendants assert that Count VII must be dismissed because the alleged damages—lost profits—are too speculative. Under New York law, recovery of lost profits for breach of contract is subject to stringent requirements:

> First, it must be demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable

of proof with reasonable certainty.  In other words, the damages may
not be merely speculative, possible or imaginary.

*Kenford Co. v. Erie Cty.*, 493 N.E.2d 234, 235 (1986).

The Plaintiffs argue that there is reasonable certainty that an "honest version" of its bid team would have won the RFP, and that the value of the University contract can be ascertained based on factors such as estimated engineering and construction costs and the University's energy consumption levels.  In any event, "arguments regarding [a] plaintiff's ability to prove lost profits 'are more appropriately addressed on a motion for summary judgment' and are 'premature' on a motion to dismiss." *RXR WWP Owner LLC v. WWP Sponsor, LLC*, 17 N.Y.S.3d 698, 698 (N.Y. App. Div. 2015) (quoting *Morris v. 702 E. Fifth St. HDFC,* 850 N.Y.S.2d 6, 6 (N.Y. App. Div. 2007)). Thus, drawing all reasonable inferences in the Plaintiffs' favor and recognizing that this case is in its early stages, I conclude that the complaint adequately pleads damages that are capable of proof.  The Plaintiffs therefore adequately plead a claim for breach of contract in Count VII that survives the Defendants' motion to dismiss.

## 2.  The Operating Agreement (Count X)

Count X asserts a breach of contract claim against Edson, Sewall Company, and Treadwell, alleging that they had a fiduciary duty and a duty of loyalty to the Plaintiffs under both the Operating Agreement and a common law certificate of formation ("COF") agreement, and that Sewall Company breached these duties and agreements by hiding Page's financial stake in Sewall Company, facilitating CVG's opportunity to purchase the Mill, providing confidential and proprietary information to a competitor, and deceiving the Plaintiffs about the Defendants' intention to oust the Plaintiffs from the RFP team.  ECF No. 1-4 ¶ 347.

The Defendants argue that in the earlier state court proceeding arising from the same dispute, the court concluded that the COF is not a contract and that the breach of contract claim only stated a claim with respect to the Operating Agreement. *see Eakin I*, 2018 Me. Bus. & Consumer LEXIS 18, *3–4.  The Defendants contend that based on this ruling, Count X is limited to the time the Operating Agreement was in effect—July 15, 2016 to December 2016.  *See* ECF No. 1-4 ¶¶ 12, 157.  The Defendants argue Count X must therefore be dismissed because the complaint fails to allege when the breaches of contract occurred and that plaintiffs' alleged "breaches" did not occur while the Operating Agreement was in effect.  The allegations in Count X refer to conduct "from August 2016 or earlier onward." *Id.* ¶ 347.  The Defendants further argue that Count X's allegations sound in fraud, which the complaint fails to plead with the particularity required by Rule 9(b).

Even though the complaint and the plaintiffs' memoranda provide less guidance than they otherwise might, the allegations, taken together with the Operating Agreement itself which is attached to the complaint, make out the existence of an agreement and a possible breach.  The Operating Agreement is a limited liability agreement, which established various duties the members of the limited liability company ("LLC") owed to the LLC and to one another.  Sewall Company (alongside Old Town Holdings and Relentless Capital) was a member of the LLC formed from the Operating Agreement, and Edson was one of its managers.  The Operating Agreement provides that, "[e]xcept as otherwise expressly limited by this Agreement, in all matters arising under or relating to this Agreement or relating to the business and internal affairs of the LLC, each Member involved in management

of the LLC and each Manager shall act in good faith and shall owe a fiduciary duty to the LLC and its members." ECF No. 1-5. § 7.10. The fiduciary duty, as detailed in the Operating Agreement, requires each manager and management-involved member "to act in a manner that such person reasonably believes to be in or not opposed to the best interest of the LLC and of the other Members," . . . "not to exploit a business opportunity for the personal benefit of such person without first disclosing such opportunity to the LLC and affording it an opportunity to exploit such opportunity," and "to maintain in confidence . . . all information relating to the LLC . . . that is reasonably identified as confidential." *Id.*

Drawing all reasonable inferences in the Plaintiffs' favor, I conclude that the alleged breaches of the Operating Agreement in Count X, which allegedly occurred "from August 2016 or earlier onward," *see* ECF No. 1-4 ¶ 347, sufficiently plead a breach of the Operating Agreement while it was in effect regardless of whether the COF was an enforceable contract. I therefore take no position on the enforceability of the COF. Furthermore, although some of the allegations in Count X sound in fraud, other alleged breaches—for example, that the Defendants facilitated CVG's purchase of the Mill and disclosed the Plaintiffs' confidential and proprietary information—do not, and are therefore not subject to Rule 9(b)'s heightened pleading standards. The Plaintiffs therefore adequately plead a claim for breach of contract in Count X that survives the Defendants' motion to dismiss.

The Defendants further argue, however, that Count X must be dismissed against Treadwell because Treadwell was not a party to the Operating Agreement, and its liability is based on its purchase of Sewall Company. The Operating

Agreement is governed by Maine law. ECF No. 1-5 § 13.10. Under Maine law, "absent a contrary agreement by the parties, or an explicit statutory provision in derogation of the established common law rule, a corporation that purchases the assets of another corporation in a *bona fide,* arm's-length transaction is not liable for the debts or liabilities of the transferor corporation." *Dir. of Bureau of Labor Standards v. Diamond Brands, Inc.*, 588 A.2d 734, 736 (Me. 1991). Because Treadwell cannot be held liable for Sewall Company's conduct based on its purchase of Sewall Company alone, and because the complaint does not allege any other facts that would render Treadwell liable for breach of the Operating Agreement, Count X is dismissed as to Treadwell.

### F. Promissory Estoppel (Counts VIII and XI)

Under Maine law, promissory estoppel is "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Harvey v. Dow*, 962 A.2d 322, 325 (Me. 2008) (quoting Restatement (Second) of Contracts § 90(1) (1981)). The Plaintiffs allege two promises which they argue reasonably induced their action: (1) that Bosch, Strosser, and Con Ed Solutions promised Relentless Capital that it would have a compensated role in Con Ed Solutions' RFP bid and that they would support the Plaintiffs' efforts to buy the Mill (Count VIII) and (2) that Sewall Company, Edson, and Treadwell (as purchaser of Sewall Company's equity) promised Old Town Utility that they would pursue the purchase of the Mill exclusively through Old Town Utility (Count XI).

The complaint's allegations concerning the Defendants' promises are conclusory and merely recite the elements of a promissory estoppel claim. The complaint otherwise makes no mention of any promises made by the Defendants beyond their agreement to the terms of the Old Town Utility Operating Agreement and the Teaming Agreement. However, "[t]he doctrine of promissory estoppel applies to promises that are otherwise unenforceable, and is invoked to enforce [such] promises . . . so as to avoid injustice." *Id.* at 325 (internal quotation marks and alterations omitted). Thus, the Teaming Agreement and the Old Town Utility Operating Agreement do not provide a foundation for a promissory estoppel claim. The complaint therefore fails to state a claim for promissory estoppel.

## G.  **Quantum Meruit (Count IX)**

The complaint's quantum meruit claim seeks compensation from Defendants Bosch, Strosser and Con Ed Solutions for the "services Relentless [Capital] and Eakin performed pursuant to the mutual promises expressed in the Teaming Agreement." ECF No. 1-4 ¶ 339.

"A valid claim in *quantum meruit* requires: that (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment." *Jay Cashman, Inc. v. Portland Pipe Line Corp.*, 559 F. Supp. 2d 85, 105 (D. Me. 2008) (quoting *Paffhausen v. Balano*, 708 A.2d 269, 271 (Me. 1998)), *report and recommendation adopted sub nom. Jay Cashman, Inc. v. Portland Pipe Line, Inc.*, 573 F. Supp. 2d 335 (D. Me. 2008). The Defendants argue that the Plaintiffs have not alleged facts demonstrating that they had a reasonable expectation that they

would receive compensation from Con Ed Solutions because the terms of the contract—the Teaming Agreement—provided that each party would bear its own cost and proceed at its own risk.

Paragraph 7 of the Teaming Agreement states that Con Ed Solutions and Relentless Capital "will each bear its own costs incurred in the preparation, submission and negotiation of said proposal. Any proposal effort on the part of the Teaming Company will be accomplished without cost to the Company." ECF No. 1-6 ¶ 7. The Plaintiffs assert that this paragraph must be read in context, and that it "means that each party bears the risk of the RFP bid failing as a whole, but neither party is expected to bear the risk of the other party simply breaching its obligations." ECF No. 60 at 48. It was therefore reasonable, the Plaintiffs argue, for Relentless Capital to expect compensation for its services if Con Ed Solutions was going to oust it from the bid. *Id.*

A claim for quantum meruit can co-exist with a written contract which addresses the same subject matter. *See Abington Constructors, Inc. v. Madison Paper Indus.*, 215 F.3d 1311, 2000 WL 62023, at *6 (1st Cir. 2000). However, this proposition contemplates a situation where "one party to the express contract does more than is required under the contract, and the other party accepts the benefit of the extra work or materials." *Id.* (quotation omitted). Here, the complaint does not allege that the Plaintiffs did more than was contemplated by the Teaming Agreement. Moreover, "to recover in *quantum meruit,* there must be a reasonable expectation on the part of the claimant to receive compensation for his services and a concurrent intention of the other party to compensate him." *Jay Cashman*, 559 F.

Supp. 2d at 105 (quoting *Paffhausen*, 708 A.2d at 272). Given the terms of the contract, there is no allegation of a "concurrent intention" by the Defendants to compensate the Plaintiffs and thus no reasonable expectation of payment. Therefore, Count IX is dismissed.

## H.     Breach of Fiduciary Duty (Count XII)

Because the Plaintiffs' claim for breach of fiduciary duty against Edson, Stevens, and Sewall Company incorporates the conduct of Count X (breach of contract) by reference, *see* ECF No. 1-4 ¶ 358, and because I previously determined that the allegations in Count X are adequately pleaded as to Sewall Company and Edson, Count XII also survives dismissal against those Defendants. As to Treadwell, for the same reason Count X was dismissed against it, Count XII is dismissed. *See supra* Section II.E.2.

Count XII appears largely, if not entirely, duplicative of Count X, but at this preliminary stage, I will not dismiss it for that reason alone.

## I.     Injunctive and Declaratory Relief (Count XIV)

In Count XIV, the Plaintiffs seek various injunctive and declaratory remedies against the University Defendants, which include (1) compelling the Trustees to authorize the Department of Administrative and Financial Services to act for them in any purchases in the future, (2) compelling the Trustees to utilize third-party review whenever a potential conflict of interest affecting any bid or contract for products or services with the University arises, and (3) declaring that the University Defendants violated certain Maine laws.

The University Defendants move separately to dismiss Count XIV, arguing that the complaint does not establish that the Plaintiffs are entitled to either injunctive or declaratory relief. As to injunctive relief, the Defendants contend that (1) the Plaintiffs lack standing because they have failed to allege a prospect of future and irreparable harm; (2) there is no private right of action under the conflict-of-interest statutes that the Plaintiffs cite as the basis for injunctive relief; and (3) even if injunctive relief were available to the Plaintiffs, the complaint fails to allege facts showing a violation of those statutes. Because I conclude that the complaint fails to allege facts that would establish standing, I limit my analysis to that issue.

To have standing to obtain injunctive relief, a party must show that it faces some prospect of future harm. *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 16 (1st Cir. 2004). "[P]ast exposure to harm will not, in and of itself, confer standing upon a litigant to obtain equitable relief '[a]bsent a sufficient likelihood that he will again be wronged in a similar way.'" *Am. Postal Workers Union v. Frank*, 968 F.2d 1373, 1376 (1st Cir. 1992) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). The Plaintiffs argue, however, that they have satisfied this element because the complaint alleges that the Plaintiffs "are likely . . . to participate in public bid processes in the future," and because "the Enterprise's key relationships are still operating, and there is a significant danger that the Enterprise's pattern of racketeering activity will continue into the future." ECF No. 1-4 ¶ 383. These allegations are threadbare and conjectural. Because the complaint contains no allegations that, if proven, establish a likelihood that the plaintiffs will be harmed again by the defendants, it fails to plead a prospect of future harm. Nevertheless, the Plaintiffs assert that they should be

permitted to seek injunctive relief because the Maine Law Court's decision in *Common Cause v. State*, 455 A.2d 1 (Me. 1983), relaxed the standing inquiry for plaintiffs who seek an injunction against unlawful state action.

The Plaintiffs' reliance on *Common Cause* is misplaced. In that case, the court held that taxpayer-plaintiffs can establish standing to seek injunctive relief in Maine state court without showing "special injury" if they allege ongoing misconduct by the state government. *Id.* at 12–13. As a threshold matter, *Common Cause* is inapposite because its holding was specific to the taxpayer-standing context, which is not presented here. But even if it were on point, it would not change the standing analysis here. In *Common Cause*, the Law Court relied on Maine constitutional and statutory law and expressly stated that it was "not bound . . . by the Supreme Court's decisions on standing in federal court." *Id.* at 8, 12–13. But in this proceeding, "standing is a question of federal law, not state law." *Hollingsworth v. Perry*, 570 U.S. 693, 715 (2013). Under federal law, the Plaintiffs do not have standing to seek injunctive relief unless they have adequately alleged a prospect of future harm. *Steir*, 383 F.3d at 16. Because the Plaintiffs have not done so, Count XIV's claim for injunctive relief is dismissed.

As to declaratory relief, the Defendants argue that certain declarations sought by the Plaintiffs—that the University Defendants violated various criminal and civil provisions—are not justiciable. Because both parties argue that Maine law determines the Plaintiffs' standing to seek declaratory relief, I apply Maine law without deciding the issue. "A plaintiff seeking declaratory relief must present for the court's consideration a justiciable controversy, previously defined by this court as

a claim of right buttressed by a sufficiently substantial interest to warrant judicial protection." *Smith v. Allstate Ins. Co.*, 483 A.2d 344, 346 (Me. 1984). A plaintiff has a sufficiently substantial interest in a declaratory judgment where the declaration would affect her concrete legal interests, such as the outcome of a pending lawsuit in which she is a party. *See id.* at 346−47. Here, the declaration the Plaintiffs request, if granted, would affect only the Plaintiffs' RICO claims (Counts I and II), which I dismiss for the reasons discussed above. Thus, the Plaintiffs do not have a substantial interest in declaratory relief that survives the motion to dismiss.

Because the Plaintiffs do not have standing to seek either injunctive or declaratory relief, Count XIV is dismissed in its entirety.

## J.    Individual Liability under Surviving Claims

The Defendants contend that the complaint fails to state a claim against any of the individual defendants, except for former Chancellor Page, since the individual defendants have been named in this suit solely because they are employed by the corporate defendants and since the allegations against them are conclusory. Of the surviving counts, two—Counts X and XII—bring claims against individual defendants David Edson (Counts X and XII) and David Stevens (Count XII). I first analyze the potential liability of both Edson and Stevens as officers of Sewall Company. I then turn to Edson's potential liability as a manager of Plaintiff Old Town Utility.

Generally, "[a] person who is a member of a limited liability company is not liable, solely by reason of being a member . . . for . . . liability of the limited liability company, whether arising in contract, tort or otherwise." 31 M.R.S.A § 1544 (West

2019).  However, in some cases officers can be held individually liable for their own tortious conduct.  *See York Marine, Inc. v. M/V Intrepid*, No. 2:15-cv-00184-JDL, 2016 WL 5372762, at *11 (D. Me. Sept. 26, 2016) (citing *Faith Temple v. DiPietro*, 130 A.3d at 379–380 n.11).  Edson and Stevens, as officers of Sewall Company, owed a fiduciary duty to Sewall Company, not to the Plaintiffs.  Although Sewall Company entered into the Operating Agreement with the Plaintiffs, Edson and Stevens did not.[11] Therefore, Edson and Stevens have no fiduciary duties to the Plaintiffs merely because of their positions as officers of Sewall Company.  Because the complaint does not plead facts that would provide some other basis for holding Stevens individually liable, Count XII is dismissed as to him.

Edson, however, allegedly owed a fiduciary duty to the plaintiffs in his capacity as a manager of Old Town Utility.  Under Maine law, managers of an LLC owe fiduciary duties to the LLC and its members.  *See Cianchette v. Cianchette*, 209 A.3d 745, 756 (Me. 2019) (citing 31 M.R.S.A. § 1559).  However, "the operating agreement of an LLC may [] limit, expand, or eliminate those duties."  *Id.* (citing 31 M.R.S.A. § 1521(3)).  Indeed, a contractual fiduciary duty can preempt a statutory fiduciary duty if the contract "expressly addresses the issue," thereby "creat[ing] a right that is solely a creature of contract."  *Id.* (alterations omitted) (quoting *Lee v. Pincus*, No. 8458-CB, 2014 WL 6066108, at *8, 2014 Del. Ch. LEXIS 229, at *25 (Del. Ch. Nov. 14, 2014)).

---

[11]  The complaint alleges that Edson was a party to the Old Town Utility Operating Agreement, *see* ECF No. 1-4 ¶ 345, but that assertion is contradicted by the Operating Agreement itself, which the Plaintiffs attach to the complaint, *see* ECF 1-5 at 17, 19.  *See Penney v. Deutsche Bank Nat'l Tr. Co.*, No. 16-CV-10482-ADB, 2017 WL 1015002, at *4 (D. Mass. Mar. 15, 2017) ("Courts may examine a contract's terms at the motion to dismiss stage to determine if the plain terms of the contract contradict a plaintiff's allegations.") (citing *Young v. Wells Fargo Bank, N A.*, 717 F.3d 224, 232 (1st Cir. 2013)).

Here, the Old Town Utility Operating Agreement specifically enumerates the fiduciary duties of managers, such as Edson. *See* ECF 1-5 § 7.10. Thus, based on the allegations in the complaint, Edson would have owed a contractual fiduciary duty to the Plaintiffs if it is shown that he was bound by the Operating Agreement's terms as a manager. Thus, while Count XII is dismissed for alleging a tortious interference claim against Edson, Count X may proceed against Edson.

The Defendants argue that the allegations against Edson are made predominantly on information and belief, such as that he met with CVG and Treadwell to replace Old Town Utility and Relentless Capital in the Con Ed Solutions' bid. *See, e.g.*, ECF 1-4 ¶¶ 136–137. That alone "does not does not give Defendants ground to seek a dismissal. Pleadings based upon information and belief are expressly authorized by the Rules of Civil Procedure." *Freeport Transit, Inc. v. McNulty*, 239 F. Supp. 2d 102, 110 (D. Me. 2003) (citing Fed. R. Civ. P. 11(b)); *accord Counter v. Healy*, No. CIV.A. 09-12144-RGS, 2010 WL 2802179, at *6 (D. Mass. June 28, 2010), *report and recommendation adopted as modified*, No. CIV.A. 09-12144-RGS, 2010 WL 2802174 (D. Mass. July 13, 2010).

In sum, Count X survives as to Edson while Count XII is dismissed as to both Edson and Stevens.

### III. CONCLUSION

For the reasons stated above, it is **ORDERED** that the Defendants' Motions to Dismiss (ECF Nos. 48 and 49) are **GRANTED IN PART** as to:

- Counts I, II, III, IV, V, VI, VIII, IX, XI, and XIV with respect to all the Defendants;

- Counts X and XII with respect to Treadwell; and

- Count XII with respect to Edson and Stevens.

The Defendants' Motions to Dismiss are otherwise **DENIED** as to Counts VII, X, and XII.

      **SO ORDERED.**

      **Dated this 30th day of September, 2019.**

                      **_/s/_ JON D. LEVY**
                      **CHIEF U.S. DISTRICT JUDGE**